[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is an action for the dissolution of a marriage and custody of a minor child brought by the plaintiff husband against the defendant wife. The parties were married in 1986 after having lived together for four years. A year and a half before the marriage the minor child, Edmund G. Vayan, Jr., was born. In this case both parties are asking for sole custody of the minor child. This is a third marriage for both parties. The plaintiff is 39 years old. The defendant is 45 years old.
The story of this relationship is both confusing and complicated. Prior to moving in with the defendant, the plaintiff, who was working in his own business providing maintenance for the motor vehicles of the Police Department of Monroe, dated the defendant and became concerned about the problems the defendant was facing at the time. She had just been divorced and she had two children by the man from whom she was divorced plus two other children by a prior marriage. The two children by her most recent marriage were ages three and five while the other children were adults. The defendant was living in a house which she had received as part of the divorce judgment but upon which there was a mortgage. She was having difficulty managing the family and paying the bills. The plaintiff apparently thought he could change all this by moving in and helping the defendant financially as well as disciplining CT Page 2122 the children.
After the plaintiff moved in, his intentions never seemed to be fully carried out. While he was working at two or three jobs and therefore out of the home a lot, he was also engaged in, first, remodeling a cottage on the property owned by the defendant and then in renovating and altering the house in which the defendant and the children and he lived. The plaintiff never, apparently, provided any assistance for the household expenses. The money that he did spend was in his efforts at building the cottage and the house, but some of that money came from rent from the cottage once he had refurbished it. That rent was in the amount of some $500.00 a month.
The child, Edmund, was born to them in 1984, but the plaintiff was not willing to marry the defendant at that time despite her request that he do so. Nevertheless, he continued to live in the house until 1986 when the husband from whom she had been divorced died. That made the defendant a widow instead of a divorcee and also paid off the mortgage on the house through her former husband's insurance which apparently was part of the mortgage contract. It was at that point that the plaintiff agreed to marry the defendant.
It is clear that the defendant was not a very good housekeeper, but it is not very easy to keep house with five children and work at the same time. The defendant went back to work six months after the plaintiff moved in with her. She has been working continuously ever since in a nursing home near her home. She works the 3:00 p. m. to 11:00 p. m. shift for the most part.
The plaintiff said he did try to correct the children, but his efforts were countermanded by the defendant who would take the children's side. He also said that when he tried to do the laundry the defendant would resent that and he ended up doing his own and Edmund's. However, he complained bitterly about the uncleanliness of the house, but did not testify to having tried to clean it up. His efforts were directed towards building the structure rather than cleaning the inside.
The end of the marriage occurred when the defendant left the home with the three children, the older two having left earlier, and had gone to her daughter's home nearby. She did not tell the plaintiff she was leaving. While she claims to CT Page 2123 have been afraid of him, there is no evidence that he was violent towards her except once when she appears to have been violent towards him prior to the marriage. The only evidence of any violence at all was when plaintiff went to see his son after the defendant: had taken him with her to her daughter's house. At that point he did try to get up the stairs to see his son and was prevented by his wife, with whom he apparently then came into physical contact. It was as a result of this episode that the defendant obtained a protective order preventing the plaintiff from entering the marital home. At the same time, an order of joint, legal custody was granted with the father to visit on Wednesdays from 5:00 p. m. to 8:00 p. m. and alternate weekends from 9:00 a.m. Saturday to 8:00 p. m. on Sunday.
The cause of this breakdown appears to be a total lack of compatibility and of communication. Apparently, they had much different ideas about bringing up children and about housekeeping. The defendant's idea of bringing up children was to give them a lot of freedom while the plaintiff's idea was to give them a lot of discipline, sometimes with the use of physical punishment somewhat forcibly as described by the defendant's son, Robert, by the prior marriage who is age 15.
While there are no specific incidents which precipitated the breakdown, the action of the defendant in leaving certainly marked the time it occurred.
Given the history of the relationship and the lack of any real violence, the court finds that both parties are responsible for the breakdown and this is, therefore, a no fault divorce.
The main issues concern the distribution of the property owned by the defendant at the time of the marriage and even before, that is, at the time that the plaintiff moved in with her, and custody of the minor child, Edmund, and support and alimony which the defendant is claiming but the plaintiff, while claiming custody, is not claiming support or alimony.
As far as custody is concerned, this is a matter which would probably be better resolved if the court were to order joint custody which is presently in effect under a pendente lite order. However, given the Emerick case, such an order would only give grounds for appeal which might or might not result in a reversal of the Emerick decision which does limit the ability CT Page 2124 of the court to decide what is in the child's best interest.
Counsel for the minor child, in a very well reasoned brief, has opted for custody with the defendant mother but with increased visitation between Edmund, Jr. and his father so that Edmund, Jr. could be with his father two nights a week, overnight, on the weeks in which he is not going to be with his father on the weekend. This seems to the court to be eminently reasonable as well as are the other proposals of counsel for the child.
While the Family Relations officer did recommend custody in the father, his reasons are not convincing. In the first place, he saw the plaintiff under stressful circumstances, that is, as she was moving back into the family home which had been partially destroyed by a fire and from which she had been absent for some time. He also stressed the fact that she had made negative comments with respect to the plaintiff father, and he thought the father's attitude expressed, to him at least, toward the defendant was much more positive and, therefore, a better image to present to Edmund, Jr. However, the plan that the defendant has for taking care of his son is to have his son live with his mother, Edmund's grandmother, and with him.
Edmund's grandmother did testify and came across as an active, concerned grandmother who, however, did not display a very positive regard for her daughter-in-law. Since she would be the one having most contact with Edmund in the course of the day, particularly if the plaintiff continues working two or three jobs as he has in the past, her attitude somewhat offsets what had been the defendant's attitude toward the plaintiff.
Moreover, whatever the attitude, as counsel for the child has pointed out, the child has done very well under the present arrangement. As she said, he appears to have understood his parents' hostilities to each other and has not let that affect his relationship with either parent.
It seemed to the court that there was very little realization on the part of the plaintiff of the difficulty of raising children and working at the same time. In fact, at one time, and that was at the time that the Family Relations officer spoke to the defendant, the defendant was also going to school as well as working and trying to take care of the family. These are not situations in which husbands and fathers normally have CT Page 2125 had experience, and the court feels that not enough understanding of the defendant's situation influenced the conclusion of the Family Relations officer.
The testimony did indicate that the defendant had been very interested in Edmund's schooling and had gone to school and consulted with his teachers. She had also taken him for his doctor's appointments and had helped him with his homework and had seen that he got to school. All of this was testified to by the plaintiff.
Consequently, the court disagrees with the Family Relation Officer's conclusion and believes that the best interest of the child lies with his being in the sole custody of his mother.
The financial situation of the parties appears to be as follows:
The plaintiff's earnings' according to his financial affidavit amount to a gross of $625.40 a week as a full time maintenance man for the Police Department of Monroe. His deductions of $220.77 result in a net weekly income of $407.63. He lists expenses of $527.28, personal debts of $4,350.00, $4,000.00 of which is a debt to his mother with whom he lives. While the plaintiff lists the liens on the house for the rebuilding thereof of $21,005.00, he is asking that the defendant pay these bills.
The plaintiff also testified to having a safety deposit box in his name and a savings account in his name into which went his income, some of which was rent from the cottage on the marital property which he remodeled.
The defendant earned a gross of $335.11 plus $142.91 from rent of the cottage and hairdressing. She also received $274.41 a week in social security for her two children by her second marriage. Her expenses are also $522.88.
The defendant's expenses, however, do not include any payment on the mortgage. She also lists $16,000.00 in outstanding debts, $12,000.00 of which was to complete the house after the plaintiff stopped working on it.
The defendant also has $19,000.00 in the Newtown CT Page 2126 Savings and Checking Bank account representing the balance remaining from the insurance she received for fire damage to the contents of the marital home. She also lists a credit union balance of $1,000.00.
Both parties are seeking sole custody of Edmund, but only the defendant is requesting support for him as well.
The marital property consists of two buildings, the marital home and a cottage remodeled for rental purposes by the plaintiff and rented since then at $500.00 plus a month. As was stated above, the property belonged to the defendant at the time the plaintiff came to live with her. While it had a mortgage on it at that time, that mortgage was paid off in 1986 as a result of the death of her second husband which provided for the payment through the mortgage contract. There is now a mortgage in the amount of some $48,922.36 on the property which was put on primarily by the plaintiff as a source of money for redoing the main house. There are also mechanic's liens on the property in the amount of some $21,000.00 also the result of bills incurred by the plaintiff for the remodeling of the house.
Both parties list the value of the house as between $235,000.00 and $240,000.00 including the cottage. With the mortgage of $48,922.36, the equity left is $186,077.64. Plaintiff is claiming a half interest in the property.
However, while the plaintiff was remodeling the cottage and the house, he was also living in the marital home with the defendant and was not contributing to the expenses of the household — according to his own testimony. The defendant was, therefore, paying not only for the food and maintenance of the house but also for the children's expenses and, in this case, particularly for Edmund's expenses.
The plaintiff first fixed the cottage apparently to produce income and then fixed the house or attempted to remodel the house. It is not clear who decided how the house should be remodeled. The defendant appeared to distance herself from the whole enterprise although she did sign the note needed for the equity line of $50,000.00.
The plaintiff claims that he spent some $124,000.00 on remodeling the cottage and the house. However, he produced no records to substantiate this claim. In fact, the only records CT Page 2127 appear to be the mortgage of now $48,922.36 and the liens which amount to $21,000.00. At the same time the plaintiff claimed that he had savings when he entered the marriage which he used for the purpose of remodeling the two houses. Again he produced no record of the same. Finally, he also claimed that he had a safety deposit box and a savings account into which his funds and the rent were deposited. There was no record produced indicating these deposits either.
The testimony of the contractor hired by the defendant was that it would cost some $92,000.00 to have done the work the plaintiff claimed to have done on the house at the time that the contractor was asked to make that determination. This was after the plaintiff had stopped working on the house.
Given the paucity of information provided the court with respect to the plaintiff's contributions to the cost of the work done on the two buildings, the only way the court can make a determination on the amount of that contribution is by a process of deduction. If we start with the $92,000.00, which the defendant's contractor testified was the value of the amount of work done on the house at the time the contractor saw it (before the fire), and deduct from that the outstanding liens of some $21,000.00 and the home equity mortgage of $50,000.00, there is a balance of $24,000.00, which would appear to be the maximum that the plaintiff contributed in cash.
While the plaintiff also claimed that he put in many hours of work on the project, there is no record of this either. Moreover, he worked full time as the auto maintenance mechanic for the Monroe Police Department during this time, initially as an independent contractor and more recently as an employee. He also testified to having worked two or three other jobs although they were not identified. It would seem that the amount of time he could spend on the work on the houses would be perhaps no more than the defendant was spending running the house and taking care of the children while also working full time. In any event, the court believes the labor in each case cancels out that of the other.
It would also seem that the $24,000.00 is offset by the contribution which the defendant made for the eight years before the marriage and during the marriage, from 1982 to 1991, in paying for the household expenses. If her earnings were similar to what she is earning now from her job and CT Page 2128 hairdressing, it would appear that she had contributed some $9,000.00 a year for the eight years. Add the fact that the house and property belonged to the defendant before the marriage and became free and clear in 1986 because of the death of her second husband and it was free and clear at the time the plaintiff obtained the $50,000.00 equity mortgage.
Given all of these facts, the court is of the opinion that the plaintiff has no interest in the house.
This conclusion also rests on the assumption that the defendant will he responsible for the outstanding equity line mortgage and the $21,000.00 in unpaid bills which the plaintiff had incurred in building the house and had not paid.
After considering all of the elements set forth in General Statutes 45b-81, 82, etc., the court makes the following findings and orders:
1. The marriage has broken down irretrievably and is hereby dissolved.
CUSTODY AND VISITATION
2. Sole custody of the minor child, Edmund Vayan, Jr., is granted to the defendant with the following visitation for the plaintiff father:
 a. Every other weekend from Friday after school to Monday morning when he must be returned to school by the father.
 b. Wednesday and Thursday nights or Thursday and Friday nights at the plaintiff's option from after school on Wednesday or Thursday until 10:00 a.m. Saturday morning of the weeks when the plaintiff does not have weekend visitation. The plaintiff must see that Edmund gets to school on time on Thursday and/or Friday mornings as the case may be.
 c. All the school vacations shall be divided between the parties equally with the first half of the next vacation being with the father and second half with the mother and alternately thereafter. CT Page 2129
 d. All major holidays except Christmas should be alternated from year to year. Christmas Eve may be celebrated with the plaintiff's family and Christmas Day with the defendant's family with Edmund sleeping over Christmas Eve and arriving at his mother's home by 10:00 a.m. Christmas Day.
 e. Each parent shall have at least three (3) weeks summer vacation with the minor child, only two (2) weeks of which may be consecutive. The periods of time to be shared should be determined by May 30th of each year and put in writing by the parents. If they are unable to reach an agreement at that time, they should refer the matter to Family Relations whose recommendation should be accepted or an appeal made to this court.
 f. The plaintiff shall have access to all of the academic, medical, hospital or other health records of Edmund as provided in General Statutes 46b-56a(e).
 g. Time should also be allowed for Edmund to be in the custody of his father for go-cart racing and the visitation schedule shall be adjusted to permit this by agreement of the parties.
SUPPORT
3. The plaintiff shall pay the defendant the sum of $104.00 a week as support for the minor child Edmund in accordance with the guidelines.
ALIMONY
4. No alimony will be awarded either party.
REAL PROPERTY
5. The defendant shall retain sole right, title and interest in the property at 50-52 Botsford Road, Newtown, Connecticut.
INSURANCE
6. Both parties shall provide medical, hospitalization, dental insurance for Edmund through their employment, if it is CT Page 2130 available. All unreimbursed medical, hospital, dental expenses shall be shared equally by the parties.
7. The plaintiff shall designate the minor child as primary beneficiary on all life insurance policies listed on his financial affidavit and on his group life insurance at work.
PERSONAL PROPERTY
8. The household contents shall be distributed in accordance with the agreement of the parties which provides for the defendant to retain ownership of all the household contents at 50-52 Botsford Hill Road, Newtown, except for a list entitled "Schedule A" as part of the agreement, to wit: defendant's exhibit two.
9. The defendant shall retain the $19,000.00 paid to her by the insurance company for the loss or damage to contents as a result of the fire except for an amount agreed upon payable to the plaintiff husband for items contained in the list entitled "Schedule A" on agreement, defendant's exhibit two.
COUNSEL FEES
10. The fees of counsel for the minor child are hereby approved and both parties are ordered to pay an equal share of those fees within thirty (30) days from the date of this judgment.
11. Each party shall pay his or her own attorney's fees.
LIABILITIES
12. The defendant shall be responsible for the payment of the amounts due MGM Electric and Stepney Building Company as well as for the mortgage presently on the property.
13. A wage execution order shall issue.
MARGARET C. DRISCOLL, JUDGE REFEREE CT Page 2131